IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SUZANA RADOJCIC CUKOVIC, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CAROLYN W. COLVIN, Acting ) <br> Commissioner of the U.S. Social ) <br> Security Administration, ) <br> ) <br> Defendant. ) | No. 15 C 2338 <br><br> Magistrate Judge Sidney I. Schenkier |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff Suzana Rodojcic Cukovic seeks reversal and remand of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for disability insurance benefits under Section 216(i) and 223(d) of the Social Security Act (doc. # 13: Pl.'s Mem.). The Commissioner seeks affirmance of the decision denying benefits (doc. # 20: Def,'s Mem.). The motion is fully briefed. For the following reasons, Ms. Cukovic's motion is granted and the Commissioner's motion is denied.

I.

Ms. Cukovic applied for benefits on October 22, 2008, alleging she became disabled on May 1, 2007 due to arthritis in her arms, elbows, hip, and legs, as well as because of a pinched nerve (R. 211, 354-56, 378-87).[2] Her date last insured was December 31, 2012 (R. 21, 55-56). The application was denied initially on February 10, 2009, and upon reconsideration on May 19,

---

[1] On April 6, 2015, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (docs. ## 5, 7).

[2] Ms. Cukovic's disability determination and transmittal states her application was filed on October 20, 2008 (R. 211). However, the application itself states that it was completed on October 22, 2008 (R. 354-56). That discrepancy is not material to our ruling in this case.

2009 (R. 211-12). Ms. Cukovic, represented by counsel, appeared and testified before administrative law judge ("ALJ") Patricia A. Bucci on December 6, 2010 (R. 172-210). Vocational expert ("VE") Jill Radke also testified. (*Id.*). The ALJ issued her written decision denying Ms. Cukovic's application on January 19, 2011 (R. 216-26). The Appeals Council granted review and remanded the case for further proceedings on May 9, 2012, directing that the ALJ further consider Ms. Cukovic's RFC regarding her concentration abilities and possible mental impairments (R. 232-33).

ALJ Marlene R. Abrams held a new hearing on January 28, 2013, at which Ms. Cukovic was represented by counsel, and VE James Radke and Medical Expert ("ME") Hugh Savage testified (R. 78-171). The case was then reassigned to David Skidmore, another ALJ, who held a third hearing on February 12, 2014 (R. 52-77). Ms. Cukovic was represented by counsel and VE Ed Pagella testified (*Id.*). The ALJ issued his decision denying Ms. Cukovic's application on June 24, 2014 (R. 21-44). The Appeals Council denied Ms. Cukovic's request for review and her request to reopen the decision, making the ALJ's ruling the final decision of the Commissioner (R. 1-4, 8). *See Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

## II.

We begin with a summary of the administrative record. Part A briefly sets forth Ms. Cukovic's background, followed by her medical record in Part B. In Part C, we discuss the testimony provided at the hearing before the ALJ. Part D sets forth the ALJ's written opinion.

### A.

Ms. Cukovic was 29 years old at her alleged disability onset date, and she was 36 years old at the time of her last hearing (R. 52, 211, 354-56). Ms. Cukovic completed high school and obtained her loan originator's license (R. 89). Ms. Cukovic's past work included working in data

2

entry and as a loan originator (R. 380). Ms. Cukovic claims she stopped working on May 1, 2007 due to her medical conditions (R. 379). This is the same day as her alleged disability onset date (R. 21).

**B.**

While not an exhaustive recitation of the voluminous medical evidence contained in the 1,247-page record, the discussion below provides a general overview. Ms. Cukovic specifically challenges the weight accorded to the medical opinions of Drs. Jasminka Kostic, Herbert Engelhard, and Julian Freeman, which are summarized below.

Ms. Cukovic was in an automobile accident on June 6, 2006 (R. 485-87). Her diagnoses the day after included a headache and pain in her neck, left shoulder, back, and lower back (R. 487). MRIs on June 14, 2006 indicated her brain and thoracic spine were normal, but that there were degenerative changes in her C5-6 and C6-7 discs in her cervical spine, 3 to 4 mm disc herniations at the C5-6 and C6-7 levels, and a generalized left lateral recess narrowing at the C6-7 level (R. 497-99). Ms. Cukovic continued to complain about pain to various physicians, with a record from Neurologist Milena Appleby from December 11, 2006 specifically indicating neck pain, lower back pain, dizziness, migraines three to four times per week, and tingling on her left side (R. 483, 488-99, 556-60). Ms. Cukovic's complaints of back pain, headaches, bilateral elbow pain, and depression continued through 2010 (R. 875-80). In early 2011, Ms. Cukovic was prescribed Norco twice per day by Dr. Sanija Bajramovic, and throughout 2011 she complained of headaches, neck pain, lower back pain, dizziness, and elbow pain to Drs. Bajramovic and Jasminka Kostic (R. 864, 870-74, 978-1007, 1030-35). Ms. Cukovic states in November 2011 that she experienced impaired vision, slurred speech, and nausea with her headaches (R. 950,

3

954). Medical records from Dr. Susanne Gonzalez show Ms. Cukovic took ten Norco tablets per day as of August 7, 2012 (R. 1097).

Ms. Cukovic also was treated by Dr. Sylvia Santos, qualified mental health professional, Marie Richard-Jackson, and licensed social worker, Francois Jolie, for mental health issues, including depression and anxiety, for the period of 2009 to 2012 (R. 577, 632-78, 770-71, 864, 870, 906, 1040-68, 1078-83). She took Lorazepam, Xanax, Abilify, and Lexapro for anxiety and nerves (R. 577, 770). Ms. Cukovic was diagnosed with bipolar disorder and major depressive disorder in 2009 (R. 583-84).

Ms. Cukovic's treating physicians offered opinions concerning her limitations. Dr. Kostic treated Ms. Cukovic from some earlier point (unspecified in the record) until December 12, 2006, and then again after December 20, 2008 (R. 451). On December 5, 2010, Dr. Kostic noted that Ms. Cukovic had experienced neck pain, lower back pain, bilateral elbow pain, and major depression since June 7, 2006 (R. 766-69).[3] Dr. Kostic stated that because of her medical issues, Ms. Cukovic could only sit or stand for ten minutes, could never lift more than ten pounds and only rarely lift less than ten pounds, had significant limitations on her ability to use her hands, fingers, and arms, had pain that constantly interfered with her concentration, and had emotional factors contributing to the severity of her pain (*Id.*). Dr. Kostic opined that Ms. Cukovic would miss more than four days of work each month (R. 769). Dr. Kostic further opined that Ms. Cukovic was not a malingerer (R. 766).

Treating physician, Dr. Engelhard, stated on February 12, 2013 that he had treated Ms. Cukovic since November 15, 2011 (R. 1184-86). Dr. Engelhard noted that Ms. Cukovic had severe chronic degenerative disc disease and chronic lower back pain that presented with

---

[3] The last digit of 2006 is cut off, making the date unclear. The court accepts Ms. Cukovic's assertion that 2006 is the correct year, as that date tracks with the date of her automobile accident.

4

symptoms of neck, arm, back, and leg pain, as well as numbness and weakness in her arms (*Id.*). Dr. Engelhard stated Ms. Cukovic could never crawl, work above her shoulders, perform gross or fine manipulation, and that she could only seldomly sit, stand, or walk in an eight-hour day, climb ladders or stairs, twist, bend or stoop, squat or kneel, or reach (R. 1185). Dr. Engelhard opined that Ms. Cukovic could not sustain a regular 40-hour week, that she would need to miss work frequently, and that her ability to concentrate was compromised (*Id.*). He further opined that Ms. Cukovic had difficulties concentrating because of medications such as hydrocodone (R. 1186). Dr. Engelhard stated that Ms. Cukovic's complaints were consistent while he saw her over a period longer than one year (*Id.*).

Dr. Freeman was retained by Ms. Cukovic to perform a medical record review and he found that Ms. Cukovic's migraine headaches met Listing 11.03 since at least May 2008; and, that her spinal stenosis in the cervical spine with radiculopathies and cord impingement equaled Listing 1.04A, C, and 11.08 since at least November 2009 (R. 1198). Dr. Freeman opined the headaches would cause at least one instance of inability to work per week, lasting six to eight hours (R. 1204). Dr. Freeman limited Ms. Cukovic to lifting only two to three pounds occasionally as of November 2009, and opined that as of May 2010, Ms. Cukovic had limitations on all postural changes to less than occasional frequency, walking and standing no more than two hours per day, and walking further than one block at a reduced pace (*Id.*).

C.

At Ms. Cukovic's first hearing on December 6, 2010 (R. 172-210), she testified that she completely stopped working on May 1, 2007 (R. 181). The ALJ specifically asked Ms. Cukovic about a recent medical record in which she stated in the present-tense that she quit working for her father because he yelled at her (R. 182). Ms. Cukovic responded that the statement

5

referenced previous employment for her father (*Id.*). Ms. Cukovic then reaffirmed she had not worked since May 1, 2007 (*Id.*). Ms. Cukovic also testified to very limited activities of daily living, with few chores or instances of leaving the house (R. 184-87). Ms. Cukovic testified she constantly dealt with pain, migraines, and vomiting (R. 184-198). VE Jill Radke testified that Ms. Cukovic's data entry work was sedentary and semi-skilled, and her loan originator work was skilled and sedentary, although the VE noted Ms. Cukovic's testimony described the position at the light level (R. 200-01). With hypothetical questions limiting a person of the claimant's age, education, and vocational background to sedentary work with the option to stand every 30 minutes, the positions of order taker and general office clerk existed (*Id.*). With a limitation to no decision-making, a person would be unable to perform those positions (R. 203).

At Ms. Cukovic's second hearing on January 28, 2013 (R. 78-171), she testified that she stopped working on May 1, 2007 (R. 90). When asked about precipitating factors, Ms. Cukovic cited her physical and mental impairments, but also pointed to a mortgage fraud investigation initiated against her in February 2007, with a felony mortgage fraud charge filed in December 2007 (R. 90-91). The case was ongoing as of the hearing (R. 91). Ms. Cukovic stated that before she stopped working, her depression became severe and she was missing unspecified appointments (R. 121). Ms. Cukovic testified that she looked for other work, but would skip the interviews and stay in bed (R. 95). Ms. Cukovic attended school the spring before her hearing, but her anxiety worsened until she stopped attending (R. 121-22).

Ms. Cukovic stated that as early as 2005 or 2006, she was unable to stand for more than ten or 15 minutes, could walk only about one city block, and the heaviest items she could lift was about the weight of a gallon of milk (R. 96-97). This line of questioning appeared to be asking about her functionality before the automobile accident because the ALJ referenced that he was

trying to obtain her baseline functionality (R. 96). Ms. Cukovic also testified that she vomited severely, including blood, from that time up to the hearing (R. 98). Ms. Cukovic testified she had weight control issues that medical professionals could not explain (R. 101). At the time of the hearing, Ms. Cukovic was five feet ten inches tall and weighed 280 pounds (R. 100). Ms. Cukovic testified she has bad pain about four days per week (R. 124-26). Ms. Cukovic testified she could walk about one third of a block, her arthritis was very bad, she had headaches every day, and she could not perform chores (R. 127-28, 131). Ms. Cukovic testified she had mood swings, anger issues, crying spells, and difficulty concentrating (R. 129-30).

Regarding her mental health, Ms. Cukovic testified she saw a psychiatrist every three months from 2009 until April or May 2012, when Medicaid stopped paying (R. 104-05). Ms. Cukovic testified her main issue was depression, which presented as racing thoughts, anxiety, and mood swings (R. 107). Ms. Cukovic stated she had difficulty getting out of bed, eating, and showering, and that her family largely cared for her eleven year old daughter (R. 108-10). Ms. Cukovic took Risperdal, Seroquel, Abilify, and Trazodone to address her mental health issues (R. 106). At the time of the hearing, Ms. Cukovic testified she was taking eight to ten tablets of Hydrocodone per day; Omeprazole and Ranitidine for her stomach issues; Xanax; a muscle relaxant for which she could not recall the name; and, up until the previous year, Gabapentin, which treats nerve pain (R. 112-14.) She testified she felt "like a zombie" when she took her medications (R. 124).

Dr. Savage, the ME, testified that Ms. Cukovic had severe bilateral elbow arthritis, cervical arthritis, right hip arthritis, status post trauma from an automobile accident when she was younger, a BMI of 44, migraine headaches, and lower back pain (R. 132-34). Dr. Savage also testified she had mild left sided spinal stenosis with left neuroforaminal narrowing, as well

7

as bipolar depression (R. 134). Dr. Savage testified he believed Ms. Cukovic would be capable of light work with additional limitations, including that she never climb ladders, ropes, or scaffolds, she only engage in occasional stooping, kneeling, crouching, crawling, and reaching overhead, and she avoid hazards and machinery (R. 140, 144-45).

VE James Radke testified that Ms. Cukovic's past work included sedentary, semi-skilled work as a data entry employee, and sedentary, skilled work as a loan originator branch manager (R. 158-59, 162). The ALJ presented the VE with a hypothetical that limited a person to light work without ever climbing ladders, ropes, or scaffolds, occasional stooping crouching, kneeling, and crawling, and avoidance of machinery and heights (R. 162). The VE testified this hypothetical person could perform Ms. Cukovich's previous work both as performed and in the national economy, unless it was medium as performed, which one record indicated (R. 162-63). The VE testified that this assessment would remain the same if the hypothetical person had the additional limitations of only occasional overhead reaching and avoiding fumes (R. 163).

The VE testified that if the hypothetical person additionally was limited to simple, routine, and repetitive tasks, the person could not perform work as a loan originator or branch manager, but could perform past work as a data entry employee, with the additional limits of only occasional decision making, occasional work setting changes, occasional interaction with the public, and occasional interactions with co-workers and supervisor (R. 163-64). If limitations were increased to permit only brief, superficial contact with the public, occasional interaction with co-workers and supervisors, and no tandem tasks, the person could still perform data entry (R. 165). Other jobs within the scope of that hypothetical included that of a mail clerk, laundry separators, and food prep workers (R. 165). The ALJ's final hypothetical limited a person to simple, routine, repetitive tasks, performed in an environment free of fast-paced production

8

requirements and involving only simple work-related decisions with few if any workplace changes, no joint or tandem work tasks, interactions with the public and coworkers that are brief and superficial, and occasional contact with supervisors (R. 166-67). In that hypothetical, the jobs of mail clerk, laundry separator, and cafeteria attendant remained (*Id.*). The VE testified such a person could miss only one unscheduled day per month, and would only be allowed to be off task five to eight percent of the day (R. 167).

Ms. Cukovic's third hearing occurred on February 12, 2014 in front of a new ALJ (R. 52). When asked why she stopped working, Ms. Cukovic stated her physical pain and depression prevented her from working anymore (R. 60). When asked what physical issues she dealt with, Ms. Cukovic testified to difficulty sitting for long periods of time, neck pain, lower back pain, severe arthritis, severe edema, vomiting, and migraines that were made worse by computers and lights (R. 60-61, 63-64). Ms. Cukovic testified her headaches had progressed to the point that she had a dull headache every day, for which she took the medication Sumatriptan, which made her vomit (R. 64, 70). Ms. Cukovic testified a neurosurgeon recommended surgery for her neck pain, but that a second opinion was skeptical of that route (R. 65). Ms. Cukovic stated that her neck pain affected her shoulders, arms, fingertips, headaches, and concentration, and it also caused numbness in her right arm (R. 66). Ms. Cukovic was taking Hydrocodone for her neck pain at the time of her hearing, which she testified made her constipated, gave her severe stomach pains, and prevented her from eating (R. 65).

Ms. Cukovic testified that she had difficulties concentrating because of pain and because of her ongoing court case (R. 63). Ms. Cukovic also testified she was diagnosed with bipolar disorder, severe depression, and post-traumatic stress disorder (R. 61, 63). She testified she cried all the time, avoided people, had difficulty meeting new people, and had panic attacks (R. 68-

9

69). Regarding daily activities, Ms. Cukovic was unable to sit comfortably for more than ten minutes, elevated her legs up to 80 percent of the day, could stand for about fifteen minutes comfortably, and could not walk one full block without needing to stop (R. 67-68).

VE Edward Pagella characterized Ms. Cukovic's past work as a loan originator as a skilled occupation at the sedentary level of physical tolerance, and that her data entry work was semi-skilled and sedentary (R. 72). The ALJ gave the following hypothetical and asked whether the person could perform Ms. Cukovic's past work:

> [A]ssume a hypothetical individual who has the same age, same education, same work history as the claimant who would be limited to light work as that term is defined in the regulations. In addition to being limited to light work, the individual would be limited – no ladder, rope or scaffold climbing, no more than frequent ramp or stair climbing. Frequent balancing, occasional stooping, kneeling, crouching and crawling. In addition to those limitations, no more than occasional overhead reaching bilaterally. No concentrated exposure to environment irritants such as fumes, odors, dust, gasses and poor ventilation. Also no concentrated exposure to hazardous machinery. Finally the individual can understand, remember and carry out simple work instructions, and execute simple workplace judgments, and is limited to routine work which I would define as no more than occasional decision making, and no more than occasional changes in the work setting. Finally from a social standpoint no more than occasional interactions with co-workers, supervisors and the public.

(R. 72-73). The VE opined such an individual could not perform Ms. Cukovic's past work, but could work as a hand packer, assembler, and a hand sorter (R. 73-74). However, such an individual would be expected to miss no more than one and three-quarter days of work per month (R. 74-75). With the hypothetical that the person would miss two days of work per month, the VE testified it would preclude work (R. 75).

The attorney asked the VE to assume both a person who cannot have exposure to fluorescent light and a person who can have only occasional exposure to fluorescent light, and the VE responded that either would preclude all occupations (*Id.*). When asked about a person who must elevate her legs three feet off the ground for 80 percent of the workday, the VE

10

testified there would be no jobs available (R. 76). If the individual was off task 15 percent of the workday due to pain and psychological impairments, all substantial gainful activity was eliminated (R. 76).

D.

On June 24, 2014, the ALJ issued a written opinion finding Ms. Cukovic not disabled pursuant to 216(i) and 223(d) of the Social Security Act (R. 21-44). In evaluating the claim, the ALJ applied the five-step sequential process detailed in 20 C.F.R. § 404.1520(a)(4), which required him to analyze whether the claimant: (1) is currently employed; (2) has a severe impairment; (3) has an impairment that meets or equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) can perform her past work; and (5) is capable of performing other work in the national economy. *See* 20 C.F.R. § 404.1520(a)(4); *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012). If the ALJ finds at Step 3 that the claimant has a severe impairment that does not equal one of the listed impairments, he must assess and make a finding about the claimant's residual functional capacity ("RFC") before moving on to Step 4. *See* 20 C.F.R. § 404.1520(e). The ALJ then uses the RFC to determine at Steps 4 and 5 whether the claimant can return to her past work or different available work in the national economy. *See* 20 C.F.R. § 404.1520(e)-(g). The claimant bears the burden of proof at Steps 1 through 4, but the burden shifts to the Commissioner at Step 5. *See Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011). If the ALJ finds the claimant to be disabled at any point in the process, he must determine whether the disability continues through the date of the decision.

At Step 1, the ALJ found that Ms. Cukovic had not engaged in substantial gainful activity from her alleged onset date on May 1, 2007 through her date last insured of December 31, 2012 (R. 23-24). At Step 2, the ALJ found Ms. Cukovic had the following severe impairments:

bilateral elbow arthritis, cervical arthritis, right hip arthritis, obesity, migraine headaches, lumbar disc disease, and bipolar disorder with depression (R. 24). At Step 3, the ALJ determined Ms. Cukovic's impairments or combination of impairments did not meet or medically equal the criteria of a listed impairment, specifically identifying Listing 11.03 (non-convulsive epilepsy), Listing 1.04 (disorders of the spine), Listing 11.08 (spinal cord or nerve root lesions), Listing 1.02 (major dysfunction of a joint), Listing 12.04 (affective disorders), and Listing 12.06 (anxiety-related disorders) (R. 25-28). The ALJ considered Ms. Cukovic's obesity, and found that the evidence did not reflect that her obesity elevated her other medically determinable impairments to meet a Listing (R. 27, 100).

The ALJ then found that Ms. Cukovic had the RFC to perform light work, but had additional limitations on climbing ladders, ropes or scaffolds, stooping, kneeling, crouching, crawling, bilaterally reaching overhead, exposure to environmental irritants, exposure to hazardous machinery, decision making, changes in work beyond occasionally, and interactions with co-workers, supervisors, and the general public beyond occasionally (R. 29). At Step 4, the ALJ found that, with that RFC, Ms. Cukovic could not perform her past work (R. 42). However, at Step 5, the ALJ found that Ms. Cukovic was not disabled because she could perform the jobs of hand packer at both the light and sedentary unskilled levels, assembler at both the light and sedentary unskilled levels, and hand sorter at both the light and sedentary unskilled levels (R. 43).

### III.

We will uphold the ALJ's determination if it is supported by substantial evidence, meaning evidence a reasonable person would accept as adequate to support the decision. *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013). This Court's role in disability cases is limited to

reviewing whether the ALJ's decision is supported by substantial evidence. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). The substantial evidence standard requires the ALJ to build a logical bridge between the evidence and his conclusion. *Pepper*, 712 F.3d at 362. While this standard does not require an ALJ to evaluate every item of evidence in the record, it does require that he grapple with evidence that may run counter to his conclusion: cherry picking only the favorable evidence is not sufficient. *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). In asking whether the ALJ's decision has adequate support, this Court will not reweigh the evidence or substitute its own judgment for the ALJ's. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

Ms. Cukovic challenges the ALJ's evaluation of the medical opinions, her RFC, and her credibility. (Pl.'s Mem. at 6-15). The Commissioner counters that the ALJ correctly assessed the medical opinions, properly considered Ms. Cukovic's allegations about her headaches and nausea, and properly determined Ms. Cukovic's credibility (Def.'s Mem. at 3-14). For the following reasons, we agree with Ms. Cukovic that the ALJ insufficiently considered the medical opinion of Dr. Engelhard, and thus need not address Ms. Cukovic's other arguments.[4]

### A.

Ms. Cukovic contends that the ALJ incorrectly gave "little weight" to the opinions of the treaters, Drs. Kostic and Engelhard. Evaluation of medical opinion evidence is governed by 20 C.F.R. § 404.1527. The so-called "treating physician rule" requires an ALJ to give controlling weight to the opinion of a social security claimant's treating physician if it is well-supported by and not in conflict with other substantial medical evidence in the record. 20 C.F.R. § 404.1527(c)(2). If the ALJ rejects the opinion of a treating doctor, he must provide a sound

---

[4] We note that Ms. Cukovic does not challenge – at least directly – the ALJ's determination that Ms. Cukovic did not meet any Listing, contrary to the opinion offered by Dr. Freeman. In any event, we find no error in the ALJ's thorough explanation that Ms. Cukovic did not meet or equal a Listing (R. 25-28).

explanation for that decision. *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). This explanation must be justified by considering a list of factors, including length, nature, and extent of the treatment relationship, the physician's specialty, the frequency of examination, diagnostic tests performed, and consistency and supportability of the physician's opinion. 20 C.F.R. § 404.1527(c)(2); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011).[5]

We acknowledge that the ALJ offered a lengthy discussion of his determination of Ms. Cukovic's RFC; however, length is not a substitute for adequacy. Of particular concern is the ALJ's analysis of treating physician Dr. Engelhard (R. 41). The ALJ's analysis was markedly brief:

> "I give little weight to the opinion of Dr. Hebert Engelhard, M.D. dated February 12, 2013 (Exhibit 39F). Although he is a treating source, the limitations listed in his opinion are out of proportion with the objective medical evidence. In this checkbox form provided by the claimant's representative, Dr. Englehard lists extreme limitations, such as only sitting or standing/walking 0-1 hour per day (Exhibit 39F/2). This exaggeration colors the entire opinion. If the claimant were truly as impaired as alleged, one would expect treatment that is more significant. The claimant has no surgery recommendations and was able to work during the relevant period. As the medical expert noted, the record does not show strength deficits, which is inconsistent with the severe limitations alleged by Dr. Englehard. He provides no explanantion for his claim that the claimant can only sit for 0-1 hours per day, and none is found in the objective evidence."

(R. 41).

To begin with, Dr. Engelhard's assessment consists of more than a checkbox form; the form provided room for additional discussion of the length of treatment and Dr. Engelhard's

---

[5] The Commissioner cites to a footnote in *Dixon* for the proposition that an ALJ need not explicitly weigh every factor in deciding not to give a treating physician's opinion controlling weight, so long as citation to a lack of supporting medical evidence and inconsistencies with the record exists (Def.'s Mem. at 9 (citing *Henke v. Astrue*, 498 Fed. App'x. 636, 640 n.3 (7th Cir. 2012)). However, numerous cases have rejected the notion that the factors need not be explicitly considered, including this Court in *Jones. See, e.g., Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014); *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010); *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *Jones v. Colvin*, 2014 WL 3536803, at *7 (N.D. Ill. July 15, 2014). Further, SSR 96-8p requires that "[t]he adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved," and "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."

findings, and Dr. Engelhard provided further explanation (R. 1184-86). In rejecting Dr. Engelhard's analysis, the ALJ failed to consider several of the required factors under § 404.1527, including the length, nature, and extent of the treatment relationship, the frequency of examination, Dr. Engelhard's specialty, and whether tests were performed (R. 41). The only factors the ALJ arguably addressed were the consistency and the supportability of Dr. Engelhard's opinion (*Id.*). Even for those factors, however, the ALJ failed to explicitly note which objective record evidence he relied on in rejecting the opinions, save for the following statements: "As the medical expert noted, the record does not show strength deficits;" and "He provides no explanation for his claim that the claimant can only sit for 0-1 hours per day, and none is found in the objective evidence" (*Id.*). In light of Dr. Engelhard's explicit statements about the length of his treatment relationship with Ms. Cukovic, his view about the consistency of her complaints, and his determination of her impairments and medical condition through observation and accepted diagnostic techniques (and not just from statements made by Ms. Cukovic), the Court cannot say that the ALJ's failure to discuss these factors was harmless.

Moreover, we find additional shortcomings with the ALJ's evaluation of Dr. Engelhard's opinion. The ALJ gives Dr. Engelhard's opinion little weight in part because he states that with the limitations she alleged, Ms. Cukovic should not have been able to work during the relevant period (R. 41). While Ms. Cukovic testified in the hearing that she last worked on May 1, 2007 (R. 90), her medical records indicate she reported her father was emotionally abusive at work in late December 2009 (R. 688), and that she stopped working for her father in March 2010 because "[h]e shouts at me all the time and I cannot take it anymore" (R.646). Although the ALJ determined that she did not engage in substantial gainful activity through her date last insured (solely due to an absence of income records), the ALJ fairly noted that these records create a

15

question about Ms. Cukovic's credibility (R. 23-24). However, the ALJ never developed the record to flesh out the extent of any work Ms. Cukovic might have performed after the alleged onset date of May 1, 2007 and when she stopped working for her father in March 2010. Nor did the ALJ note that upon direct questioning about this discrepancy by the ALJ in the first hearing, Ms. Cukovic reaffirmed that May 1, 2007 was her date of last employment and stated that her statements regarding quitting work for her father because he yelled at her were referencing a previous time (R. 182).

In any event, even if this work took place after May 1, 2007, the Seventh Circuit has held that post-onset date employment does not automatically exclude a finding of disability, as financial imperative may compel a person to work at a level greater than his or her capacity; or, a person may be "carried" by a sympathetic party even though the person cannot truly perform the job. *Wilder v. Apfel*, 153 F.3d 799, 801 (7th Cir. 1998) ("There was also evidence that Wilder wasn't actually fit to work; that she worked out of financial desperation; that she could do her job only because one of the residents of the retirement home sat with her all day and her daughters constantly looked in on her at work. As we pointed out in our previous opinion, employment is not proof positive of ability to work, since disabled people, if desperate (or employed by an altruist), can often hold a job"); *Knox v. Astrue*, 327 Fed. Appx. 652, 656 (7th Cir. 2009) ("[A]n applicant may be disabled even if he is currently working – because of an unusually accommodating employer or out of a desperate need . . . ."). It was inappropriate for the ALJ to use evidence of Ms. Cukovic's post-onset date employment to reject Dr. Engelhard's opinion that she could not work without more evidence of the true nature of any work she performed.

In remanding this case, we do not suggest that the ALJ must find that Ms. Cukovic is disabled. The ALJ plainly found it significant that Ms. Cukovic continued to perform some work until March 2010. But, the ALJ also found it significant that her alleged onset date of May 1, 2007 was nearly one year after her car accident, and corresponded to an investigation and indictment of Ms. Cukovic for mortgage fraud (R. 30, 40). That is a piece of evidence well within the ALJ's discretion to consider and to determine the weight it should receive. But in rejecting treater evidence, the ALJ cannot merely indulge assumptions about the nature of Ms. Cukovic's post-onset date work (or school). Assumptions are insufficient to provide the logical bridge needed to link the evidence to the ALJ's rejection of a treater's opinion. *Pepper*, 712, F.3d at 362.

## CONCLUSION

For the reasons set forth above, the Court grants Ms. Cukovic's motion for summary judgment (doc. # 13) and denies the Commissioner's request for summary affirmance (doc. #20). We remand the case for further proceedings consistent with this Memorandum Opinion and Order. This case is terminated.[6]

ENTER:

SIDNEY I. SCHENKIER
**United States Magistrate Judge**

**Dated: August 15, 2016**

---

[6] Given our decision above to remand this case based on the ALJ's failure to appropriately address the treater's medical opinion, we need not address the remaining issues about the evaluation of the medical opinions, Ms. Cukovic's RFC, and her credibility.

17